UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| _Plaintiff_, | ) | Case No. 3:15-CV-1127 |
| | ) | |
| v. | ) | Judge Collier |
| | ) | |
| JOSEPH McGREGOR ANDREWS, _et al._, | ) | |
| | ) | |
| _Defendants_. | ) | |

## <u>M E M O R A N D U M</u>

Before the Court are motions for summary judgment filed by each of the three organizational defendants in this diversity action arising out of an alleged sexual assault at a college fraternity house.

Plaintiff Jane Doe[1] ("Doe") brings causes of action for negligence and gross negligence against Defendants The Pi Kappa Alpha International Fraternity, Inc. ("National" or "Pi Kappa Alpha"), The Delta Epsilon Chapter of Pi Kappa Alpha International Fraternity, Inc. (the "Chapter"), and Delta Epsilon House Corporation (the "House Corporation"; and collectively with National and the Chapter, the "Fraternity Defendants"). Each of the Fraternity Defendants moves for summary judgment on Doe's causes of action against them for negligence and gross negligence, as well as on any implied claims she may have made for vicarious liability and negligent infliction of emotional distress. (Docs. 141, 144, and 147.) Doe filed a collective response to the motions (Doc. 159), and the Fraternity Defendants filed a joint reply (Doc. 169). The Court will **GRANT** the Fraternity Defendants' motions.

---

[1] Doe is a pseudonym used in public filings pursuant to the Court's protective order. (Doc. 12.)

I.      **BACKGROUND**

A.      **National and the Standards**

National is a collegiate fraternal organization whose stated purpose is to advance its members' educational interests, their leadership skills, and their standards of life, happiness, and integrity. It is a Tennessee corporation headquartered in Memphis, Tennessee. Its executive or governing board is known as its Supreme Council.

The relationship between National and its respective chapters is described in a document entitled "Explanation of the Relationship Between The Pi Kappa Alpha International Fraternity & Chapters." (*See* Doc. 147-9 at 4–11.) This document has been adopted by National and each of its chapters. National also makes available to its chapters a document they may use entitled "Explanation of the Relationship Between Chapters of The Pi Kappa Alpha International Fraternity & Members" discussing the relationship between chapters and their respective members. (*See* Doc. 147-9 at 12–20.)

A local chapter must maintain certain standards as part of its charter in order to operate as a chapter of Pi Kappa Alpha in good standing. Those standards are set out in a one-page document entitled "The Pi Kappa Alpha International Fraternity Standards" (the "Standards"). (Doc. 147-9 at 21.) The Standards are drafted, presented, voted on, and adopted by the chapters at a biennial convention.

The topics addressed in the Standards are "Alcohol & Drugs," "Hazing," "Sexual Abuse," "Fire, Health, & Safety," and "Education." The first standard under "Alcohol & Drugs" is that "[t]he possession, use, and/or consumption of alcoholic beverages, while on chapter premises, during an official chapter event, or in any situation sponsored or endorsed by the chapter, must be in compliance with any and all applicable laws of the state, county, city and

university."  (*Id.*)  Other "Alcohol & Drugs" standards include prohibitions on drinking games, illegal drugs, the purchase of alcohol with chapter funds or in the name of the chapter, and the use of alcohol at recruitment, rush, or new member programs.

The two standards under "Sexual Abuse" are:

1.     No chapter shall tolerate or condone any form of sexually abusive behavior, whether physical, mental or emotional.  This includes any actions that are demeaning to individuals, including but not limited to sexual assault, and sexual harassment.

2.     Each member and new member shall refuse to engage in any sexually abusive behavior.

(*Id.*)  The "Education" standards require the chapter president to present the Standards to the members at the beginning of each academic period, to educate each member and new member on risk management practices annually, and to adopt a chapter-specific health and safety program annually.  The Standards end with certain disclaimers, including that

Each chapter . . . and its members are self-operated by adult college students, which means that these standards are self-enforcing by the chapters . . . and their members.  It should be understood that the Fraternity DOES NOT and CANNOT oversee, monitor, supervise or direct the daily or any other activities of hundreds of chapters and thousands of members . . . .

(*Id.* (emphasis in original).)

A chapter may choose not to adopt or adhere to the Standards at any time.  The chapter would then lose the right to use the name, logo, trademark, educational materials, or any other intellectual property associated with National and would risk having its charter suspended or revoked.  The Supreme Council has the authority to suspend a chapter's charter.  A chapter's charter may only be revoked by chapter representatives during a biennial convention.  Revocation or suspension of a chapter's charter does not affect the chapter's ability to function as an unincorporated entity under a different name.

National does not have the ability to discipline, suspend, or revoke individual members of its chapters. (Doc. 162 [Pl.'s Resp. to Statement of Undisputed Facts] ¶ 15.)

According to the deposition testimony of National's Rule 30(b)(6) witness, as of April 11, 2015, the date on which Doe alleges she was assaulted, National had knowledge of two sexual-misconduct allegations that had led to the discipline of a member or a chapter: first, a chapter had expelled a member based on a criminal sexual assault charge in Utah in 2014; second, National had suspended a chapter's charter in Florida in 2014 based on sexual misconduct allegations. In addition, National had knowledge of sexual assault allegations against a member in California in 2014, and it had knowledge of an alleged sexual assault at a chapter party in Montana in 2013.[2]

## B. The Chapter

The Chapter is a Pi Kappa Alpha chapter in good standing with National. It operates on or near the campus of the University of Tennessee at Chattanooga ("UTC"). Individual members of the Chapter pay dues to the Chapter, and the Chapter pays fees to National. The Chapter posted a copy of the Standards in its off-campus fraternity house (the "House").

As of April 11, 2015, National had no knowledge of any allegations of sexual assault regarding the Chapter or any member of the Chapter. Also as of April 11, 2015, the local president of the Chapter had heard no allegations or suspicions of sexual misconduct by a member of the Chapter.

---

[2] Doe discusses a fifth incident, an alleged sexual assault at a recruiting event in Indiana in November 2015. This incident took place after the events addressed in this litigation.

## C.    The House Corporation and the Lease

The House Corporation owns the House and leases it to the Chapter under a lease (the "Lease") dated February 15, 2010.  The Lease requires the Chapter to pay monthly installments of rent to the House Corporation in exchange for the right to occupy the House.[3]  (Doc. 145-1 at 1.)  The Chapter is generally responsible for upkeep of the House, including collecting rent from resident members, lawn care, routine maintenance, plumbing, routine heating and air repairs, and utilities.  (*Id.* ¶¶ 2–9.)  The House Corporation is responsible for maintaining structural systems, namely the roof, exterior walls, and the foundation; replacing mechanical systems if the need for replacement results from normal wear and tear; property taxes; and any mortgage payments on the House.  (*Id.* ¶¶ 12, 15, 16.)  The House Corporation is responsible for fire insurance, the Chapter is responsible for liability insurance, and individual tenants are responsible for any personal property insurance they wish to procure.  (*Id.* ¶ 14.)

The Lease also includes the following conditions:

> That the Chapter use and permit the use of the Premises only as a fraternity house for the Chapter and in compliance with all Federal, State or Province, and local laws, regulations and ordinances, as well as the "Standards for retention of Membership, Officer Status and Chapter Charter in Good Standing" of the Pi Kappa Alpha International Fraternity, and any applicable and relevant rules of the Chapter's host institution (University or College) and any duly authorized governing bodies of the Fraternity system in which the Chapter has membership. The Chapter shall have the sole responsibility of insuring that the members comply with this provision and a violation of this covenant shall result in the immediate termination of all the Chapter's rights to possess and use the property as is provided below.
>
> . . .

---

[3] The Lease requires monthly payments of $4,000.  The parties agree it is undisputed that the Chapter makes monthly rent payments of $4,800.  The discrepancy between these two amounts is not material to the motions before the Court.

> That the duly authorized agents and representatives of the Corporation and/or University and/or Pi Kappa Alpha Fraternity have the right at any time to enter upon and in (sic) the Premises for the purpose of inspecting them.

(*Id.* ¶¶ 10, 19.)  As of April 11, 2015, the House Corporation was not aware of any violations of the Lease or of any allegations of underage drinking at the House.

### D.    The Party and the Alleged Sexual Assault

In the spring of 2015, Defendant Joseph McGregor Andrews ("Andrews") was a UTC student and a member of the Chapter.  On April 11, 2015, he attended a "rave" themed party the Chapter hosted at the House.  The Chapter had roped off the party area with caution tape and locked non-public entrance doors to ensure guests checked into the party.  The Chapter's risk-management team checked guests' identification at the entrance to the party and placed an X on guests who were under twenty-one using an indelible black marker and placed a wristband on guests who were of drinking age.  The Chapter used "sober monitors" stationed around the party to monitor the guests.  Sober monitors were responsible for turning people away from the party or removing them from the party when they appeared to be too intoxicated.

The Chapter did not purchase alcohol for the party.  Guests who brought alcohol had to check that alcohol in with sober monitors, and it was kept behind a table.  Guests wearing an "above age" wristband could check their alcohol back out when they wanted to drink it.

Doe attended the party as Andrews's guest.  She had consumed some alcohol voluntarily before arriving at the House.  Andrews had been drinking at the House throughout the day.  Both Doe and Andrews were under twenty-one years old and therefore under age for drinking alcohol.

In the car on the way to the party, Andrews said he wanted Doe to get black out drunk and he wanted to hook up with her.  Given the context, it is reasonable to infer in Doe's favor for

purposes of the Fraternity Defendants' motions that Andrews was referring to sexual activity. Doe asked the driver of the car to look out for her, and he agreed to do so.

After initially arriving at the House, Doe went back out with Andrews to buy more alcohol. On returning to the House, Doe and Andrews stayed on the porch for a time. The porch was not roped off and was not considered part of the party area. While on the porch, Doe consumed fewer than four swigs of whiskey. Andrews encouraged her to keep drinking, at times holding the bottle to her mouth for her to drink. All of the alcohol Doe consumed that night was provided by Andrews, not by the Chapter.[4]

While on the porch, Doe told Andrews that his longtime girlfriend, Haley Smith, had been cheating on him. Andrews became upset. Sometime after this, Andrews and Doe went from the porch into the party area.

Doe asserts she does not remember anything that happened between when she left the porch and the next morning because she was "blackout" drunk.[5] She asserts, however, that Andrews sexually assaulted her in a locked bathroom of the House, breaking one of her teeth in the process. The Fraternity Defendants admit only for purposes of their motions for summary judgment that Andrews committed a sexual assault on Doe in the bathroom of the House.

---

[4] Doe claims this asserted fact is "Disputed. See Fact No. 60." (*See* Doc. 162 ¶ 66.) Doe's response to Paragraph 60 of the Fraternity Defendants' statements of fact is "Undisputed." (*See id.* ¶ 60.) Doe points to no evidence that she received alcohol from the Chapter. Doe also claims the president of the Chapter was on the porch drinking with them.

[5] Doe alleges that members of the Chapter formed a circle around her and Andrews inside the House and "chanted" at them to incite Andrews to have sex with her. The Fraternity Defendants argue this is inadmissible hearsay, as the only evidence of its occurring comes from a friend of Doe who testified about what Doe told her later in the evening. Doe now has no memory of a chant or of telling her friend about a chant. Doe does not respond to the argument that Doe's statements are inadmissible hearsay when Doe seeks to admit them. In addition, Doe does not refer to the alleged chant in her response to the Fraternity Defendants' motions. Lacking admissible evidence of a chant, the Court does not consider these allegations further.

Andrews then obtained a sober ride and took Doe back to his apartment. Once there, Doe vomited on herself from alcohol consumption. A female friend of Doe's picked Doe up from Andrews's apartment and the two women slept in their car. The next morning, they returned to their college in Birmingham, Alabama. Doe discovered her chipped tooth around noon that day and inquired into her actions of the night before. Doe was then confronted by Andrews's ex-girlfriend, Smith, who was angry about a picture Andrews had sent Smith showing Doe lying in his bed. Doe asked Andrews that afternoon if they had had sex, and he told her they sort of had sex in the bathroom of the House. Doe went to a rape crisis center and made complaints of sexual assault to UTC and law enforcement.

Andrews was suspended by the Chapter in April 2015.


## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). A factual dispute is "material" only if its resolution might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for

trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The Court may not weigh the evidence or make credibility determinations. *Id.* at 255. If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.  DISCUSSION

Doe asserts causes of against the Fraternity Defendants for negligence and gross negligence. (Doc. 1.) Each of the Fraternity Defendants moves for summary judgment on those causes of action, on any implied claims for vicarious liability for the actions of each other or of Andrews, and on any claim for negligent infliction of emotional distress. (Docs. 141, 144, and 147.) Doe responded in opposition to the three motions collectively (Doc. 159), and the Fraternity Defendants filed a joint reply (Doc. 169).

**A.    Implied Claims for Vicarious Liability and Negligent Infliction of Emotional Distress**

Doe's only causes of action against the Fraternity Defendants are negligence and gross negligence.  (*See* Doc. 1, Counts A & B.)  The Fraternity Defendants nevertheless each say Doe "appears to allege that PIKE National [is or was] vicariously liable for the actions of PIKE Chapter" and each move for summary judgment on any implied claims for vicarious liability for the actions of each other or of Andrews.  (Doc. 142 at 3, 5–9; Doc. 145 at 3, 5–9; Doc. 148 at 3, 5–13.)   The Fraternity Defendants also move for summary judgment on any implied claims for negligent infliction of emotional distress.  (Doc. 142 at 17–20; Doc. 145 at 16–19; Doc. 148 at 23–26.)

National argues there is no basis for vicarious liability against it because, even assuming the relationship between National and the Chapter is analogous to the relationship between a parent corporation and a subsidiary, Doe has not overcome the presumption of corporate separateness.  (Doc. 148 at 5–13.)  National further argues there is no legal basis to pierce the so-called corporate veil between it and the Chapter or to find they are alter egos of each other.  Finally, conceding that the relationship between National and its chapters is most similar to the relationship between a franchisor and its franchisees, National argues Doe cannot satisfy the "single employer" test for the purposes of imputing liability to National as the so-called parent entity or franchisor.

The Chapter argues Doe has not established an agency relationship between the Chapter and Andrews sufficient to hold the Chapter liable for any actions of Andrews.  (Doc. 142 at 5–9.)  It argues there is no admissible evidence the Chapter instigated, supported, ratified, or encouraged Andrews to commit a sexual assault or that Andrews's alleged commission of a

sexual assault was in accordance with his fundamental agreement of association with the Chapter. The Chapter also argues it cannot be held vicariously liable for the intentional torts Doe has alleged against Andrews, because any such intentional tort would have been an intentional act not in accordance with the policies and procedures of the Chapter.

The House Corporation argues that it is the Chapter's landlord under the Lease and it does not have the right or authority to control the actions of the Chapter. (Doc. 145 at 5–9.) It argues that as the owner of the House, it did not have actual or constructive notice of dangerous or defective conditions before Doe's alleged injury. The House Corporation also argues it did not have constructive notice through past criminal activity that suggested the type of crime Doe alleges would occur. Last, the House Corporation argues it cannot be held vicariously liable for the intervening intentional acts of Andrews as a third party to the lease between the House Corporation and the Chapter.

All three of the Fraternity Defendants argue Doe has not provided the medical or scientific proof necessary to support a claim for damages for negligent infliction of emotional distress. They also argue there is no evidence to show their respective actions were sufficiently "outrageous" to support a claim for negligent infliction of emotional distress.

It appears from Doe's response that she disclaims any vicarious-liability claims. She characterizes the Fraternity Defendants' motions as attempts

> . . . to distance themselves from their member and brother, Defendant Andrews, and Plaintiff by claiming the absence of a series of relationships that Plaintiff has never alleged (*i.e.*, agency, franchisor/franchisee, *etc.*).
>
> In other words, each of the Fraternity Defendants, though same in name and mission, somehow seek to remove themselves from each other. These are all the same, though slightly varied, exercises in distraction.
>
> The reality is simpler. PIKE National, PIKE Chapter, and PIKE House have duties of care to social invitees, like Jane Doe, at their functions.

11

(Doc. 159 at 2.)

Doe's statement that she has never alleged agency relationships among the defendants tends to indicate she does not seek to hold any of the Fraternity Defendants vicariously liable for the actions of the others or of Andrews. Her statement that the Fraternity Defendants are all the "same in name and mission"[6] seems to point in the other direction—that the Fraternity Defendants should all be treated as one entity. Overall, however, from Doe's disclaimer of any agency theories, from the absence of any express causes of action for vicarious liability in the Complaint, and from the absence of any specific facts or case law responding to the Fraternity Defendants' arguments and authority on vicarious liability, the Court concludes the Fraternity Defendants are entitled to judgment as a matter of law on any vicarious liability claims Doe may seek to assert.

Doe makes no response at all to the Fraternity Defendants' request for summary judgment on any claim for negligent infliction of emotional distress. The Court concludes the Fraternity Defendants are similarly entitled to summary judgment on any such claims Doe may seek to assert.

Having addressed the so-called implied claims in Doe's Complaint, the Court turns next to the argument on which Doe's response focuses: the respective duties of care the Fraternity Defendants owed to Doe.

---

[6] National and the Chapter both share "Pi Kappa Alpha International Fraternity" in their names; the Chapter and the House Corporation both share "Delta Epsilon" in their names.

**B.     Negligence**

Doe brings a cause of action for negligence against the Fraternity Defendants.  (Doc. 1 ¶¶ 38–51.)     She alleges the Fraternity Defendants had the duty to protect her against unreasonable risks of physical harm, to prevent Andrews from harming her, and to give her aid once she had suffered harm.  (*Id.* ¶¶ 43–46.)

To prove negligence under Tennessee law, a plaintiff must establish "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).

Whether a defendant owes a plaintiff a duty of care is a question of law.  *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005).  "In general, all persons have a duty 'to use reasonable care to refrain from conduct that will foreseeably cause injury to others.'"  *Id.* (quoting *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997)).

A defendant who would not otherwise have a duty towards a plaintiff may assume one by voluntarily undertaking to act.  *Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 300 (Tenn. 2007).  Specifically, "[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully."  *Id.* (quoting *Biscan*, 160 S.W.3d at 482–83).  For example, where an employee told a contractor that a switchgear in need of repair was low voltage, the employer assumed a duty of reasonable care to make sure the statement was accurate.  *Id.*  Where an employer voluntarily undertook to select a life insurance carrier for its employees, the employer was required to use reasonable care to select a solvent carrier.  *Nidiffer v. Clinchfield R. Co.*, 600 S.W.2d 242, 246 (Tenn. 1980).  And where an adult host allowed

minors to drink alcohol at a party his daughter held at his home, the host voluntarily assumed a duty to the minors attending the party by making, but not enforcing, a rule that any guests who drank alcohol would have to spend the night and by assuming responsibility to make sure that if they drank, they would be safe. *Biscan*, 160 S.W.3d at 483.

Alternatively, the general duty to act with reasonable care to avoid causing someone an injury can expand to encompass an affirmative duty to act to protect a plaintiff from a third party if the defendant stands in a special relationship to either the plaintiff or the third party. *Biscan*, 160 S.W.3d at 478–79 (quoting *Turner*, 957 S.W.2d at 818). Non-exclusive examples of such a special relationship include the relationships between "parent and child, employer and employee, and innkeeper and guest." *Id.* at 479 n.4 (quoting Restatement (2d) of Torts §§ 314–15).

When a court seeks to determine whether a special relationship has given rise to a duty to protect a plaintiff from a third party, public-policy considerations are crucial. *Id.* at 479 (quoting *Burroughs v. Magee*, 118 S.W.3d 323, 329 (Tenn. 2003)). A court must "also consider whether the plaintiff's injuries and the manner in which they occurred were reasonably foreseeable." *Id.* (quoting *Burroughs*, 118 S.W.3d at 329). Finally, the court must consider the balancing test that generally determines whether a defendant owed a duty of care to a particular plaintiff, as follows:

> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

*Id.* at 479–80 (quoting *McCall*, 913 S.W.2d at 153). The foreseeability prong of the balancing test "is paramount because '[f]oreseeability is the test of negligence.'" *Id.* at 480 (quoting *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992)) (alteration in original).

A duty to protect a plaintiff from the actions of a third party only arises if the defendant has the means and ability to control the third party. *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 100 (Tenn. Ct. App. 2001); *see also Newton v. Tinsley*, 970 S.W.2d 490, 493 (Tenn. Ct. App. 1997) ("in order for the duty to control a third party's conduct to arise, the actor must have the means and ability to control the third party"). The means or ability to control need not be total; some ability to control the actions of the third party may be enough for a duty to arise. *Biscan*, 160 S.W.3d at 481. For example, an adult host allowing the consumption of alcohol by minors at a party his daughter held at his home had sufficient reasonable means to control those guests for a duty to arise to prevent them from drinking and driving. *Id.* at 481–82. The host did not have to choose between doing nothing and assaulting or falsely imprisoning intoxicated minors who tried to leave; he had in the past monitored guests during his children's parties and corralled the cars of drinking guests behind a fence. He had also made a rule that any guests who drank alcohol would have to spend the night, but he had not made any attempt to enforce that rule. Such means of attempting control were sufficient to satisfy the requirement of having the means and ability to control a third party.

### 1. The Fraternity Defendants' Arguments Regarding Duty

National first argues it had no duty to protect Doe from either Andrews or the Chapter because it did not have the means or ability to control either one. (Doc. 148.) National argues it was merely an administrative resource for the Chapter and it did not control or monitor the Chapter's daily activities. It also argues it did not have the power to control Andrews or prevent him from committing an intentional tort against Doe.

National next argues it had no duty to protect Doe from Andrews in the first place because there is no proof Andrews's sexual assault on Doe was reasonably foreseeable, and a

"plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the [defendant's] power more probably than not would have prevented the injury." (Doc. 148 at 17–19 (quoting *Linder Constr.*, 845 S.W.2d at 178).) National argues it had neither actual nor constructive notice of any previous sexual misconduct by either the Chapter or Andrews before April 11, 2015. While two sexual assault charges in other states had at that time led to the expulsion of one chapter member and the revocation of a chapter's charter, National argues "isolated instances of sexual assault in different states do not provide constructive notice that an alleged sexual assault would occur in Chattanooga, Tennessee." (*Id.* at 19.) National argues the prohibitions on sexual misconduct in the Standards neither can nor should provide proof that a sexual assault on Doe was reasonably foreseeable. Specifically, if a prohibition on conduct in a policy made that conduct reasonably foreseeable such that a duty to prevent it could be inferred from the policy alone, National argues, organizations would have an incentive to get rid of all types of anti-harassment policies in order to limit their potential liability later on.

The Chapter's arguments are similar. (Doc. 142 at 9–14.) It argues it had no control over Andrews's intentional acts and cannot be found negligent for failing to do what it had no power to do. It further argues Andrews's acts were not reasonably foreseeable, in that it had no knowledge of any past sexual assault allegations against Andrews or otherwise against the Chapter. It argues neither the Standards nor accusations of sexual assault against Pi Kappa Alpha members in other states make a sexual assault at their Chapter reasonably foreseeable. The Chapter also argues that it had no duty to Doe under a failure-to-train theory where there were no prior acts of sexual misconduct to put the Chapter on notice as to the need for additional training.

The House Corporation argues it did not have the ability to control the Chapter because it did not have the right to do so under the Lease. (Doc. 145 at 5, 11.) While the Lease gave the House Corporation the right to terminate it if the House Corporation received notice of a violation of the Lease or the Standards, it had not received any such notice as of April 11, 2015. The House Corporation also argues a sexual assault in the House was not reasonably foreseeable, in that it had no notice of earlier sexual misconduct by any members of the Chapter or in the House.

### 2. Doe's Arguments Regarding Duty

Doe filed a collective response to the Fraternity Defendants' respective motions. She does not directly respond to the case law and arguments asserted in the various motions, but she advances several theories to demonstrate the existence of duties running from the Fraternity Defendants to her.

First, Doe discusses *Brown v. Delta Tau Delta,* 118 A.3d 789 (Me. 2015), which she says demonstrates the changing times with regard to "a fraternity's responsibility for its misconduct." (Doc. 159 at 9.) In *Delta Tau Delta*, the Supreme Judicial Court of Maine held that a national fraternity had duties founded on premises liability to an invitee who had been sexually assaulted at a local function. The fraternity in that case had adopted Member Responsibility Guidelines (the "Guidelines") seeking to prevent alcohol and substance abuse and sexual misconduct. Among other things, the court concluded the Guidelines' discussion of the dangers of substance abuse and sexual misconduct established it was foreseeable that a member would become intoxicated and commit sexual assault. Doe likens National's Standards to Delta Tau Delta's Guidelines, argues that both fraternities enforce their respective standards, and implicitly asks the Court to find a duty in this case just as the *Delta Tau Delta* court did.

17

The Court does not find *Delta Tau Delta* persuasive to establish that any of the Fraternity Defendants had a duty of care to Doe to prevent the harm she alleges she suffered from Andrews. *Delta Tau Delta* is not binding authority on this Court, nor does it address the law of negligence in the state of Tennessee. *See Journey Acquisition—II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 452 (6th Cir. 2016) (a district court exercising jurisdiction based on diversity of citizenship must apply the substantive law of the state in which it sits). Doe's argument that "[t]imes have changed" and the Court should follow *Delta Tau Delta* because courts "are recognizing" the liability of fraternities for their members' misconduct is not persuasive carries little weight in the face of this Court's obligation to apply the current negligence law of the state of Tennessee, not alleged trends in the law in other states. Second, the *Delta Tau Delta* court found a duty in the context of a premises-liability claim, a theory not advanced by Doe here. The *Delta Tau Delta* court expressly rejected the theory at issue here, a special relationship between the plaintiff and any of the defendants in that case. 118 A.3d at 792. The *Delta Tau Delta* court also expressly rejected the theory that the landlord of the fraternity house where the assault took place had any duties at all to the social invitees of the chapter in the context of a sexual assault by one of the members. In all, the Court sees no support for Doe's negligence claim in *Delta Tau Delta.*

Second, Doe argues that through the Standards, which prohibit both sexual abuse and alcohol abuse, the Fraternity Defendants assumed duties to Doe. (Doc. 159 at 10.) National promulgated and required adherence to the Standards, the Chapter agreed to follow the Standards, and the House Corporation required the Chapter to follow the Standards. Doe argues that the Standards demonstrate a sexual assault related to alcohol abuse was foreseeable, and that the other factors of the balancing test favor finding a duty. The Court will consider this argument with respect to each of the Fraternity Defendants below.

Third, Doe argues that Tennessee's common law, including the provisions Tennessee has adopted from the Restatement (Second) of Torts, gives rise to duties from the Fraternity Defendants to Doe. (Doc. 159 at 13–14.) Doe points to two cases in which fraternities were held to have duties to protect prospective members from dangerous hazing. *Id.* (citing *Alexander v. Kappa Alpha Psi Fraternity, Inc.,* 464 F. Supp. 2d 751 (M.D. Tenn. 2006) and *Morrison v. Kappa Alpha Psi Fraternity*, 738 So.2d 1105 (La. Ct. App. 1999)). Doe argues that Tennessee has adopted part of the Restatement (Second) of Torts § 314A, requiring certain defendants to render aid to third parties under certain circumstances, and the Fraternity Defendants had duties to aid Doe when it was obvious she was "blackout" drunk. As with Doe's arguments regarding the Standards, the Court will consider this argument with respect to each of the Fraternity Defendants below.

Last, Doe submits that it is the opinion of two expert witnesses in this case that the Fraternity Defendants had duties to Doe. (Doc. 159 at 15–16.) Doe's expert, John D. Foubert, Ph.D., believes all three of the Fraternity Defendants had duties to Doe. An expert for the Fraternity Defendants, David Westol, also testified to his belief that National "had a duty to take reasonable steps to address" the danger of alcohol consumption.[7] (Doc. 159 at 15 n.70 (quoting Doc. 160-1 [Westol. Dep. excerpt] at 117).)

An expert witness may testify "in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702(a). Whether a defendant owes a plaintiff a duty of care, however, is a question of law. *Biscan*, 160 S.W.3d at 478. Expert

---

[7] Doe characterizes Westol as testifying that all three of the Fraternity Defendants had this duty. (Doc. 159 at 15.) However, Westol's deposition testimony on this point refers only to "the national entities." Neither the Chapter nor the House Corporation is a national entity.

opinions offered to the Court to show the existence of a duty of care are thus not proper under Rule 702: they neither help the trier of fact understand the evidence nor help the trier of fact determine a fact in issue. The opinions of experts cannot substitute for demonstrating the existence of a relevant duty of care under the applicable law. The Court therefore will not consider Doe's argument regarding expert opinions on the existence of duties further.

### 3. National's Duties to Doe

Doe argues that by promulgating Standards prohibiting sexually abusive behavior, National undertook a duty to protect Doe from sexual assault. (Doc. 159 at 10.) But Doe has not explained in what way National "assumed to act" with respect to Doe such that it became subject to a "duty of acting carefully" with respect to Doe. *See Bennett*, 216 S.W.3d at 300. National set Standards it required its chapters and members to meet in order to maintain their charters and membership in the fraternity. Two of those Standards were that alcohol consumption had to follow all applicable laws and that no one should engage in sexually abusive behavior. If those Standards were not followed, National could suspend and eventually revoke a charter. The former chapter could continue any activities it pleased, so long as it stopped using National's intellectual property. But National did not make any representations or give any assurances to Doe or any other guest at the party as to anything National would do at the party. *Compare Bennett*, 216 S.W.3d at 300 (employer assumed a duty regarding the voltage of a switchgear when employee expressly told contractor the switchgear was low voltage) *and Biscan*, 160 S.W.3d at 483 (host assumed duty to minor guests by making but not enforcing a rule that drinking guests would have to spend the night). The Standards themselves, in fact, disclaim any obligation, ability, or intent to oversee or direct the actual actions of its chapters or members. (Doc. 147-9 at 21.)

To the extent Doe argues she or Andrews had a special relationship with National such that National had a duty to protect her from Andrews, the argument fails for lack of evidence National had the means and ability to control Andrews. *See Lett*, 60 S.W.3d at 100. Doe does not dispute that National did not have the ability to discipline, suspend, or revoke its individual members. Doe points to no other way National had the means or ability to control Andrews.

Doe points to two cases in which national fraternities were held to have duties to protect prospective members from dangerous hazing. (Doc. 159 at 13–14 (citing *Alexander,* 464 F. Supp. 2d 751 and *Morrison*, 738 So.2d 1105)). In both of those cases, however, the national fraternities had prior notice that hazing activities might in fact be going on at the chapters in question. Here, National had no indication of sexual misconduct at the Chapter.[8] National did have notice of sexual misconduct at two other chapters, and it had notice of allegations of sexual misconduct at two more. Doe has provided no authority for the proposition that knowledge of potential sexual misconduct anywhere puts an organization on notice of likely intentional sexual misconduct everywhere.

Doe argues that Tennessee has adopted the portion of the Restatement (Second) of Torts § 314A requiring certain defendants to render aid to third parties under certain circumstances. (Doc. 159 at 14 (citing Restatement (2d) of Torts § 314A) ("A possessor of land who holds it open to the public is under a . . . duty to members of the public who enter in response to his invitation" "to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others").) Tennessee has indeed held that "a

---

[8] In addition, the Court is not convinced that a direct analogy can be made between a fraternity's duty to protect its potential members from planned, systematic hazing imposed by a chapter or a group of its members and its duty to protect a chapter's social guests from the unilateral intentional tort of a single member.

social guest-host relationship . . . create[s] a duty on [the host's] part to exercise reasonable care to render aid . . . when [the host] knew or should have known that [the guest] was seriously injured. *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 860 (Tenn. 1985). But it is undisputed National was neither the possessor of the land nor the host of the event at which Doe alleges she was injured. As such, *Lindsey* does not apply to National.[9]

Because National did not have a duty to protect or aid Doe under the circumstances presented in this case, National is entitled to judgment as a matter of law on Doe's negligence claim.

### 4. The Chapter's Duties to Doe

Like National, the Chapter argues it had no control over Andrews's intentional acts and therefore cannot have had a duty to protect Doe from him. But unlike National, the Chapter was hosting the party, its representatives were at the party, and they were acting in roles of authority

---

[9] Doe refers to two other sections of the Restatement (Second) as sources of a duty in her complaint. (Doc. 1 ¶ 44.) Section 319 of the Restatement states the principle that a person "who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Doe offers no authority to show this section has been adopted in Tennessee. Even if it had, this section applies in such situations as caring for people with dangerous contagious diseases or with known violent tendencies. *See* Restatement (2d) of Torts § 319 cmt. a. Doe has not provided any evidence that fraternities in general, or the Chapter in particular, are populated predominantly by antisocial individuals just waiting for an opportunity to commit violent crimes if the national organizations fail to keep them under constant control. The Court will not address this Section further.

Doe also refers to Section 318, discussing the duties of the owner of land who allows a third party to use that land. If the owner is present, he or she has "a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others . . . , if the [owner] (a) knows or has reason to know that he has the ability to control the third person, and (b) knows or should know of the necessity and opportunity for exercising such control." Restatement (2d) of Torts § 318. It does not appear that Tennessee has adopted this rule. *See Newton v. Tinsley*, 970 S.W.2d 490, 493 n.3 (Tenn. Ct. App. 1998) (noting the Tennessee Court of Appeals has specifically declined to adopt Section 318). Moreover, National was neither the possessor of the House nor present at the time of the party.

for the party. The sober monitors and risk-management team were there, checking identification, applying a wristband or black X depending on the attendee's age, requiring attendees to check any alcohol, and expelling or turning away attendees who appeared overly intoxicated. In addition, it was the Chapter, not National, that had the ability to discipline Andrews if he violated the Standards regarding alcohol or sexual abuse. The Chapter indeed did just that when it suspended Andrews as a result of Doe's allegations of sexual assault. The Chapter thus had the means and ability to control Andrews that were not available to National. These means of control were not total, but they did not need to have been for a duty to arise. As in *Biscan*, some ability to control a third party's actions can be enough for a duty to arise. 160 S.W.3d at 481.

Because the Chapter had at least some ability to control Andrews's conduct, the Court will consider whether a special relationship arose between the Chapter as the host of the party and Doe as an invitee sufficient to give rise to a duty to protect Doe from Andrews's actions. To do so, the Court must consider whether public policies support the imposition of a duty on the Chapter; the "paramount" question of foreseeability, namely whether Doe's "injuries and the manner in which they occurred were reasonably foreseeable"; and the other factors of the balancing test:

> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

*Biscan*, 160 S.W.3d at 479–80.

### a. Public Policy

Doe does not point to a public policy that applies in this case. She does, however, point to *Biscan* as a roadmap for finding a duty by the Fraternity Defendants in this case, and the Court will begin there. In *Biscan*, the Court found clear public-policy support for the imposition of a duty on an adult host to prevent minors from driving under the influence, focusing on three considerations. First, the court noted the state's prohibition on minors consuming alcohol. Doe and Andrews, while not minors, were under age for drinking alcohol. Tennessee's public policy against individuals under the age of twenty-one consuming alcohol is therefore at issue here. Second, the *Biscan* court noted Tennessee's prohibition on driving under the influence of alcohol. This public policy is not at issue here, because Doe is not claiming she was injured as a result of anyone driving under the influence of alcohol. Third, the *Biscan* court noted that "because of their immaturity and inexperience, a duty may exist toward minors where it might not exist towards adults." 160 S.W.3d at 480 (citing *Townsley v. Yellow Cab Co.*, 237 S.W. 58 (Tenn. 1922). This public policy does not come into play because neither Doe nor Andrews was a minor at the time of the incident.

Thus, one of Tennessee's three public-policy interests discussed in *Biscan* is relevant here: preventing under-age drinking. The connection between this public policy and Doe's harm is somewhat indirect, however. Doe does not claim she was injured by alcohol poisoning or drunk driving, for example. She appears to claim she was injured because Andrews forced or encouraged her to get so drunk that she was incapable of consenting to sexual activity. Her claimed harm is from the alleged sexual assault, not the degree of her intoxication. In addition, Doe's references to the amount Andrews had drunk on the day of the party imply an argument that Andrews's consumption of alcohol led him to commit sexual assault. Again, this is a less

than direct connection between the conduct to be protected against and the identified public policy against under-age drinking.

But Tennessee does have a public policy on point, embodied in Tennessee's laws prohibiting rape and sexual assault. There is a direct connection between the public policy against sexual assault and the harm Doe claims from a sexual assault. The Court therefore concludes that the public policy of Tennessee sufficiently supports the imposition of a duty under the circumstances of this case.

### b.      Foreseeability

Second, the Court must consider whether Doe's injuries and the manner in which they occurred were reasonably foreseeable. *Id.* at 479. Doe argues the Standards themselves demonstrate a sexual assault related to alcohol abuse was foreseeable, because the Standards both require alcohol consumption to be in compliance with all state laws and prohibit sexually abusive behavior, including sexual assault. (Doc. 159 at 12.) She states the Fraternity Defendants "must be doing this for a reason," implying that the Fraternity Defendants recognize a correlation between underage drinking and sexual assault. (*Id.* at 10.)

The Chapter argues it had no information from any source that any sexual misconduct had occurred at a Chapter event before April 11, 2015, and it had no information that Andrews had ever been accused of sexual misconduct before that date. (Doc. 142 at 13.) It therefore argues a sexual assault was not reasonably foreseeable. The Chapter further argues that allegations of sexual assault against a few Pi Kappa Alpha chapters in other states were not sufficient to make a sexual assault at their Chapter reasonably foreseeable. The Chapter also argues that using Standards that prohibit misconduct to establish foreseeability and a duty to prevent the misconduct, as the Supreme Judicial Court of Maine did in *Delta Tau Delta*, is

inappropriate and sets a dangerous precedent of discouraging positive policies, guidelines, and educational materials. (Doc. 169 at 3–4.)

The Court concludes Doe's injuries and the manner in which they occurred were not reasonably foreseeable so as to give rise to a special relationship with Doe. Certainly, a sexual assault at a fraternity party—or any party—is foreseeable, in the sense that it does not defy the rules of logic and common sense to think that it might happen. But foreseeability for purposes of identifying duties under tort law requires more than that. It requires at least *reasonable* foreseeability—a foreseeability built on something more than mere possibilities. Reasonable foreseeability in the sense required here is, for example, the foreseeability that the spouse of a highly contagious patient may catch the patient's disease, *Bradshaw v. Daniel*, 854 S.W.2d 865, 872 (Tenn. 1993), or that a certain medication might impair the driving ability of a patient with a susceptible medical history, *Burroughs*, 118 S.W.3d at 39. Or, as in *Biscan*, it is the foreseeability of problems from drunk driving when the host himself recognized that specific risk in allowing minors to drink alcohol on his property and had taken actions to prevent the risk at previous parties. 160 S.W.3d at 481.

Here, however, there is no evidence the Chapter had notice of any sexual misconduct by any Chapter member, including Andrews. The Court agrees with the Chapter that knowledge of allegations of sexual misconduct at a few other Pi Kappa Alpha chapters was not sufficient to raise the possibility of sexual assault to such reasonable foreseeability as to give rise to a duty by the Chapter to take additional specific precautions to protect its guests, such as Doe. The Court also concludes that reasonable foreseeability cannot be found in the prohibitions on illegal

alcohol consumption and sexually abusive behavior in the Standards.[10]  Doe has presented no

authority to support a finding of reasonable foreseeability without some particularized indication

that misconduct might be taking place.  For the Court to penalize the Chapter for adopting a

prohibition on undesirable behavior by finding a duty to take additional steps to prevent that

behavior when there are no other indications it could take place would be inappropriate.  It

would also, as the Chapter argues, risk the perverse result of discouraging organizations from

having policies against undesirable behaviors.  The Court concludes that a sexual assault by

Andrews was not so reasonably foreseeable as to support a duty by the Chapter to undertake

affirmative action to protect Doe from Andrews.

### c.        The Balancing-Test Factors and Special Relationship

Third, the Court considers the remaining factors of the balancing test and weighs them

along with public policy and foreseeability to determine whether a special relationship gave rise

to a duty from the Chapter to Doe.

The magnitude of the potential harm from sexual assault is great.

Hosting social events does have some social value and usefulness to the Chapter, given

the relationship-based purposes of the organization.  Allowing alcohol at such social events,

however, does little to enhance the social value and usefulness of the activity, and undermines

them to the extent the activity involves underage persons drinking.

---

[10] The Court disagrees with Doe's position that because the Standards address both alcohol consumption and sexual abuse, the Chapter acknowledges that alcohol consumption is a cause of sexual abuse to such an extent that the act of consuming alcohol at a fraternity party makes sexual abuse at that party reasonably foreseeable.  The Standards also address hazing, as well as fire and safety codes.  The Court sees no grounds to connect the two categories of behavior for its foreseeability analysis merely because they are both discussed in the same document.

As to the feasibility, relative costs, usefulness, and safety of proposed safer conduct, Doe argues it would be feasible to employ safer measures because "[t]hat's what the Standards [were] supposed to accomplish." (Doc. 159 at 11.) Merely saying the goal of the Standards was to have safer events does not identify potential alternative measures or allow the Court to assess their feasibility, relative burdens, or safety, however. Plaintiff makes no specific suggestions for what the Chapter could have done to protect her from an assault by Andrews, other than to suggest the Chapter should not have any alcohol at its parties. Doe's focus on the presence of alcohol at the party overlooks the fact that her injury resulted from alleged intentional acts of sexual aggression, not alcohol, however.[11]

While the existence of a relevant public policy would support the imposition of a special relationship, the lack of reasonable foreseeability of Doe's harm and the manner in which she would be harmed is a "paramount factor" pointing away from a special relationship. Even considering Tennessee's public policy and the magnitude of the potential harm from sexual assault, none of the factors, separately or together, weigh so heavily in favor of finding a duty as to overcome the lack of reasonable foreseeability—if indeed, any combination of factors could ever be held to support a special relationship without reasonable foreseeability. The Court concludes there was not a special relationship between the Chapter and Doe that gave rise to a duty for the Chapter to protect Doe from the intentional acts of Andrews.

---

[11] It is part of Doe's theory that she could not have consented to sexual activity with Andrews because she was intoxicated. It is Andrews's intentional conduct, however, from which Doe says the Chapter should have protected her.

#### d.        Voluntary Assumption of Duty

Doe also argues that by agreeing to follow the Standards, the Chapter undertook a duty to protect her from sexual assault.  (Doc. 159 at 10.)  More specifically, she argues the Chapter assumed a duty by physically posting the Standards in the House.  (*Id.* at 12.)  But as discussed above with respect to National, Doe has not explained in what way the Chapter "assumed to act" with respect to Doe such that it became subject to a "duty of acting carefully" with respect to her. *See Bennett*, 216 S.W.3d at 300.

Two of the Standards posted in the House were that alcohol consumption had to follow all applicable laws and that no one should engage in sexually abusive behavior.  They did not, however, contain any promises or undertakings directed toward social guests of the Chapter. Rather, the preamble to the Standards states that the Standards have to be maintained for the Chapter to keep its charter in good standing with National, and members and officers have to follow the Standards for the members and officers to remain in good standing with the Chapter. Put another way, the Standards embody duties the Chapter undertook to National and members undertook to the Chapter, not duties the Chapter undertook to social invitees.  The Court concludes the Chapter did not assume a duty to protect Doe from sexual assault by posting and agreeing to follow the Standards.

#### e.        Social Host-Guest Duty under *Lindsey*

Finally, as the host of the party, the Chapter had the duty under *Lindsey* to exercise reasonable care to render aid to Doe if the Chapter knew or had reason to know she was seriously injured.  *See Lindsey*, 689 S.W.2d at 860.  Doe argues the Chapter had a duty to render aid to her both when she was assaulted and when she was black out drunk.  (Doc. 159 at 14.)  But there is no evidence the Chapter knew or had reason to know Doe needed aid in either case.  The alleged

assault took place behind a closed bathroom door.[12]  Doe points to no evidence that anyone but

Andrews and Doe knew or should have known an assault was taking place while they were in the

bathroom together.  She also points to no evidence that would have shown an assault had just

taken place after they left the bathroom.  She argues her "black out drunk" condition "had to be

obvious."  *Id.*  This argument is circular.  There is evidence in the record that Doe was drunk

enough to throw up when she returned to Andrews's apartment and drunk enough not to

remember what had happened the next morning.  But there is no evidence that anyone else at the

party at the time should have known Doe was drunk enough to require aid.  Without evidence

that the Chapter knew or should have known Doe was seriously injured or impaired, no duty

arose under *Lindsey*.

The Chapter did not have a duty to protect or aid Doe under the circumstances presented

in this case.  The Chapter is therefore entitled to judgment as a matter of law on Doe's

negligence claim.

### 5.      The House Corporation's Duties to Doe

Doe argues the House Corporation undertook a duty to protect Doe from sexual assault

by requiring the Chapter to follow the Standards.  (Doc. 159 at 10.)  As explained above with

regard to National, Doe has not shown in what way the House Corporation "assumed to act" with

respect to Doe such that it became subject to a "duty of acting carefully" with respect to her.  *See*

*Bennett*, 216 S.W.3d at 300.  Like National, the House Corporation did not make any

representations or give any assurances to Doe or any other guest at the party as to anything the

House Corporation would do at the party.  *Compare Bennett*, 216 S.W.3d at 300 (employer

---

[12] Although Andrews knew what had occurred, the Court has already held above that the
Chapter is not vicariously liable for Andrews's actions.

assumed a duty regarding the voltage of a switchgear when employee expressly told contractor the switchgear was low voltage) *and Biscan*, 160 S.W.3d at 483 (host assumed duty to minor guests by making but not enforcing a rule that drinking guests would have to spend the night).

The House Corporation also had no duty to Doe under a special-relationship theory. The House Corporation was indeed the owner of the House in which Doe was a social invitee. But the House Corporation had neither the means nor the ability to control Andrews. *See Lett*, 60 S.W.3d at 100. The House Corporation had a contractual relationship with the Chapter, not with individual members. If the House Corporation received notice of violations of the Lease, including violations of the Standards, it had the right to terminate the Lease. It is undisputed that as of April 11, 2015, the House Corporation had not received any such notice. Even if it had received such notice, it had no right or ability to exercise control over Andrews's actions as an individual member of the Chapter.

No duties could arise for the House Corporation under Restatement (Second) of Torts § 314A, because there is no evidence the House Corporation knew Doe was ill, injured, or endangered. *See* Restatement (2d) of Torts § 314A cmt. f ("The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured.") And even if Tennessee had adopted Section 318 of the Restatement, *see supra* n.9, the House Corporation was not present at the time of the party.

The House Corporation did not have a duty to protect or aid Doe under the circumstances presented in this case. The House Corporation is therefore entitled to judgment as a matter of law on Doe's negligence claim.

## C.  Gross Negligence

Count B of Doe's complaint asserts a cause of action for gross negligence against the Fraternity Defendants.  (Doc. 1 ¶¶ 52–58.)  She claims the negligent acts described in Count A were "done with utter unconcern for the safety of others or done with such reckless disregard for the rights of others that a conscious indifference to consequences is implied in law," and that she is entitled to punitive damages because Andrews's actions were "intentional, malicious, and/or reckless."  (*Id.* ¶ 58.)

The Fraternity Defendants rely on their earlier arguments regarding the lack of support for a claim of negligence and assert there are no facts in the record to further show they acted with utter unconcern for the safety of others or reckless disregard for the rights of others.  (Doc. 142 at 24; Doc. 145 at 21; Doc. 148 at 29–30.)  Doe points to no such facts in the record, and in fact makes no mention of gross negligence in her response.

The Fraternity Defendants are entitled to summary judgment on Doe's cause of action for gross negligence for the same reasons for which they are entitled to judgment on Doe's cause of action for negligence.  They are also entitled to summary judgment on gross negligence because Doe has not supplied any facts to support the utter unconcern or reckless disregard required for this cause of action.


## IV.  CONCLUSION

For the reasons set forth above, the Court will **GRANT** the Fraternity Defendants' motions for summary judgment and **DISMISS** Doe's causes of action against the Fraternity Defendants.

**An appropriate order will enter.**


/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**